**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| ITG BRANDS, LLC, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 2017-0129-AGB |
| REYNOLDS AMERICAN, INC. and | ) | |
| R.J. REYNOLDS TOBACCO | ) | |
| COMPANY, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Date Submitted: September 11, 2017
Date Decided: November 30, 2017

Stephen C. Norman, Matthew F. Davis, and Matthew R. Dreyfuss, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Robert J. Brookhiser and Elizabeth B. McCallum, BAKER & HOSTETLER LLP, Washington, DC; *Attorneys for Plaintiff*.

Gregory P. Williams, Rudolf Koch, Robert L. Burns, and Matthew D. Perri, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Peter J. Biersteker and C. Kevin Marshall, JONES DAY, Washington, DC; *Attorneys for Defendants*.

**BOUCHARD, C.**

In the late 1990's, several major tobacco manufacturers in the United States entered into agreements with each of the fifty states in response to claims concerning the health risks of smoking. They first entered into separate agreements with four states (Florida, Minnesota, Mississippi, and Texas) before entering into a Master Settlement Agreement governing the remaining forty-six states. Under each of these agreements, the tobacco manufacturers are required to make annual payments based on their volume of tobacco product sales in the United States in the year to which the payment relates.

The Master Settlement Agreement prohibits a party from transferring any of its cigarette products unless the transferee agrees to assume that party's obligations under the Master Settlement Agreement before the transfer occurs. The agreements with the other four states (the "Previously Settled States" or "PSS") that were entered into earlier do not contain a similar transfer provision.

In July 2014, ITG Brands, LLC entered into an Asset Purchase Agreement to acquire for approximately $7.1 billion four cigarette brands owned by R.J. Reynolds Tobacco Company ("Reynolds Tobacco"), a wholly-owned subsidiary of Reynolds American, Inc. ("Reynolds American") (together, "Reynolds"). To ensure that ITG Brands would assume Reynolds Tobacco's obligations to the Previously Settled States as of the closing, in particular its annual payment obligations, the Asset Purchase Agreement requires that ITG Brands "use its reasonable best efforts" to

1

reach agreements with those states with respect to the four cigarette brands that ITG

Brands contracted to acquire, as follows:

> [ITG Brands] shall use its reasonable best efforts to reach agreements
> with each of the Previously Settled States, by which [ITG Brands] will
> assume, as of the Closing, the obligations of a Settling Defendant under
> the PSS Agreement with each such State, with respect to the Acquired
> Tobacco Cigarette Brands, on the same basis as the Settling Defendants
> prior to the Closing.[1]

The ITG Brands-Reynolds transaction closed on June 12, 2015 (the

"Closing"). As of the Closing, however, ITG Brands had not reached an agreement

to assume Reynolds Tobacco's obligations under its settlement agreement with

Florida. Reynolds Tobacco and ITG Brands are now embroiled in litigation in

Florida state court where Florida is seeking to hold both Reynolds Tobacco and ITG

Brands accountable for annual payments of approximately $30 million associated

with post-Closing sales of the four cigarette brands that ITG Brands purchased. ITG

Brands responded by suing Reynolds in this Court, invoking the Delaware exclusive

forum provision in the Asset Purchase Agreement.

The parties have filed cross-motions for partial judgment on the pleadings

over whether ITG Brands' obligation to use its reasonable best efforts to reach an

agreement with Florida terminated at the Closing. The resolution of this question

---

[1] Compl. (Dkt. 1) Ex. 1 (Asset Purchase Agreement) F-2 § 2.2.

2

turns on the meaning of the last four words of the provision quoted above: "prior to the Closing."

ITG Brands contends that this phrase defines the *temporal scope* of its obligation to use its reasonable best efforts to reach an agreement with Florida to assume Reynolds Tobacco's obligations, and that this obligation terminated when the ITG Brands-Reynolds transaction closed in June 2015. Thus, according to ITG Brands, it is off the hook for making payments to Florida for post-Closing sales of the four cigarette brands it acquired *even though it received (and continues to receive) the benefit of the sales to which those payments relate*.

Reynolds contends that "prior to the Closing" as used in the foregoing provision defines the *nature of the obligations* that ITG Brands agreed to assume, *i.e.*, the same obligations Reynolds Tobacco owed to Florida "prior to the Closing." Thus, according to Reynolds, ITG Brands' obligation to use its reasonable best efforts did not terminate at the Closing and continues until ITG Brands actually has made reasonable best efforts to assume the annual payment obligations for post-Closing sales of the four cigarette brands it acquired from Reynolds.

For the reasons explained below, I find that Reynolds' interpretation is supported by the plain language of the Asset Purchase Agreement and that ITG Brands' interpretation is not. Accordingly, Reynolds' motion for partial judgment on the pleadings is granted, and ITG Brands' cross-motion is denied.

## I.    BACKGROUND

Unless noted otherwise, the facts in this opinion are drawn from the allegations in the Verified Complaint that are admitted in defendants' Answer and Verified Counterclaims and documents incorporated therein.[2]   Any additional facts are either not subject to reasonable dispute or subject to judicial notice.

### A.    Reynolds Tobacco and Other Tobacco Manufacturers Enter into Settlement Agreements with the States

In the mid-1990s, a number of states sued Reynolds Tobacco, Lorillard Tobacco Company, and other large tobacco manufacturers for publicly misrepresenting the addictiveness and health risks of smoking.  In 1997 and 1998, Reynolds Tobacco, Lorillard Tobacco Company, and other manufacturers (the "Settling Defendants") entered into separate settlement agreements with four states: Florida, Minnesota, Mississippi, and Texas (as defined above, the "Previously Settled States" or "PSS").  Reynolds Tobacco's 1997 settlement agreement with Florida is referred to hereafter as the "Florida Settlement Agreement."  In November 1998, Reynolds Tobacco and other tobacco manufacturers entered into a Master

---

[2] *See OSI Sys., Inc. v. Instrumentarium Corp.*, 892 A.2d 1086, 1090 (Del. Ch. 2006) ("When there are cross-motions for judgment on the pleadings, the court . . . may consider the unambiguous terms of exhibits attached to the pleadings, including those incorporated by reference.").

Settlement Agreement (the "Master Settlement Agreement") governing the remaining forty-six states.

In the Florida Settlement Agreement, the Settling Defendants collectively agreed to pay Florida an initial amount of $750 million, followed by annual payments.[3] Each Settling Defendant's annual payments are calculated from a base amount "pro rata in proportion equal to its respective Market Share" for that year.[4] The Florida Settlement Agreement and the other PSS settlement agreements have no provisions requiring the assumption of settlement payment obligations upon the transfer of cigarette brands, nor is there any mechanism for a transferee to join those agreements.

Like the PSS settlement agreements, the Master Settlement Agreement requires that the manufacturers make annual payments based on their volume of sales in the year to which the payment relates.[5] Unlike the PSS settlement agreements, the Master Settlement Agreement provides in Section XVIII(c) that a party may not transfer any of its products covered by the agreement to a nonparty, unless the nonparty assumes the party's obligations under the Master Settlement Agreement before the transfer occurs:

---

[3] Compl. (Dkt. 1) Ex. 4. §§ II.B.1-3.

[4] Compl. (Dkt. 1) Ex. 4 § II.B.3; 1998 Amend. § 7.

[5] Defs.' Answer and Verified Countercl. (hereafter, "Answer") (Dkt. 30) ¶ 26; Compl. (Dkt. 1) Ex. 5 § IX(c).

No Original Participating Manufacturer may sell or otherwise transfer or permit the sale or transfer of any of its Cigarette brands, Brand Names, Cigarette product formulas or Cigarette businesses . . . to any person or entity unless such person or entity is an Original Participating Manufacturer or prior to the sale or acquisition agrees to assume the obligations of an Original Participating Manufacturer with respect to such Cigarette brands, Brand Names, Cigarette product formulas or businesses.[6]

## B.      The Reynolds-Lorillard Merger and Asset Purchase Agreement

On July 15, 2014, Reynolds American, the parent of Reynolds Tobacco, and Lorillard, Inc., the parent of Lorillard Tobacco Company, entered into a merger agreement.  To facilitate regulatory approval of the merger, Reynolds American and ITG Brands entered into an Asset Purchase Agreement dated as of July 15, 2014 ("Asset Purchase Agreement"), in which Reynolds American agreed to sell four cigarette brands (Winston, Salem, Kool, and Maverick) (the "Acquired Tobacco Cigarette Brands") to ITG Brands for approximately $7.1 billion.  Both transactions closed on June 12, 2015 (as defined above, the "Closing").

The Asset Purchase Agreement provides that ITG Brands will assume liabilities under the Master Settlement Agreement and the PSS settlement agreements.  The terms for doing so are detailed in an exhibit to the Asset Purchase

---

[6] Compl. (Dkt. 1) Ex. 5 § XVIII(c).

Agreement entitled "Agreed Assumption Terms," which is part of the Asset Purchase Agreement.[7]

With respect to the Master Settlement Agreement, Section 2.1 of the Agreed Assumption Terms provides that "[a]s required by MSA § XVIII(c), [ITG Brands] shall assume, as of the Closing, the obligations of an [Original Participating Manufacturer] with respect to all of the Acquired Tobacco Cigarette Brands."[8] With respect to the PSS settlement agreements, Section 2.2 of the Agreed Assumption Terms imposes an obligation on ITG Brands to use its "reasonable best efforts" to reach agreements with each of the Previously Settled States, as follows:

> [ITG Brands], with the assistance and cooperation of [Reynolds American] and Lorillard in communications and negotiations as required by the Agreement, shall use its reasonable best efforts to reach agreements with each of the Previously Settled States, by which [ITG Brands] will assume, as of the Closing, the obligations of a Settling Defendant under the PSS Agreement with each such State, with respect to the Acquired Tobacco Cigarette Brands, on the same basis as the Settling Defendants prior to the Closing. Provided, however, that such agreements shall include terms providing either that any direct-pay statute (also known as an equity-fee law or NPM-fee law) of a Previously Settled State does not apply to the Acquired Tobacco Cigarette Brands or that, if [ITG Brands] is required to make payments with respect to Acquired Tobacco Cigarette Brands under a direct-pay statute (or any distributor or other party is required to make such payments with respect to the Acquired Tobacco Cigarette Brands),

---

[7] Compl. (Dkt. 1) Ex. 1 (Asset Purchase Agreement) A-2 (defining the term "Agreement" to include the Asset Purchase Agreement and its "Exhibits").

[8] Compl. (Dkt. 1) Ex. 1 (Asset Purchase Agreement) F-2 § 2.1.

[ITG Brands] will receive a credit against otherwise due payments under the PSS settlement equal to the full payments made.[9]

The term "direct-pay statute" in the second sentence of Section 2.2 refers to statutes that impose fees on cigarette sales by tobacco manufacturers that have not entered into a settlement agreement with the state. Three of the Previously Settled States (Minnesota, Mississippi, and Texas) have direct-pay statutes.[10] Florida does not. One purpose of the direct-pay statutes is to compensate the state for the costs attributable to cigarette use.[11]

The Agreed Assumption Terms are addressed in the body of the Asset Purchase Agreement in Sections 6.19 and 6.20. Both provisions provide that the duties specified in the Agreed Assumption Terms apply "both before and after the Closing":

- "As soon as practicable after the date of this Agreement, and *both before and after the Closing*, each of the Parties shall . . . make all such communications with and provide all such information to . . . the States . . . and take all such other steps . . . as are necessary

---

[9] Compl. (Dkt. 1) Ex. 1 (Asset Purchase Agreement) F-2 § 2.2.

[10] *See* Minn. Stat. § 297F.24, Miss. Code. Ann. § 27-70-5, Texas Health and Safety Code § 161.603.

[11] *See* Minn. Stat. Ann. § 297F.24 ("The purpose of this fee is to: (1) ensure that manufacturers of nonsettlement cigarettes pay fees to the state that are comparable to costs attributable to the use of the cigarettes . . ."); Miss. Code. Ann. § 27-70-1 ("The purpose of this chapter is to . . . [p]rotect the tobacco settlement agreement, and funding . . . for programs that are funded wholly or partly by payments to this state under the tobacco settlement agreement . . ."); Tex. Health & Safety Code Ann. § 161.601 ("The purpose of this subchapter is to: (1) recover health care costs to the state imposed by non-settling manufacturers . . .").

8

and/or expedient for the purposes of . . . *obtaining the agreement as necessary of the States . . . to the Agreed Assumption Terms.*"[12]

- ". . . each of the Parties undertakes that from and after the date of this Agreement and *both before and after the Closing* it shall . . . adhere fully to and not deviate in any respect from the Agreed Assumption Terms including in any communications with any of the States . . ."[13]

- "Each of [ITG Brands] and [Reynolds American] further undertakes *from and after the Closing*, to take . . . all such steps as are necessary or expedient . . . to cause the Agreed Assumption Terms, as applicable, to become fully effective and binding on each of the States."[14]

## C.    ITG Brands' Efforts to Join the Settlement Agreements

On July 15, 2014, ITG Brands, Reynolds Tobacco, and Lorillard Tobacco Company contacted the Attorneys General of all fifty states, informing them that, with respect to the transferred brands, ITG Brands would assume the obligations of an Original Participating Manufacturer under the Master Settlement Agreement and would attempt to join the PSS settlement agreements in Mississippi, Florida, Texas, and Minnesota.[15]

In June 2015, ITG Brands joined the Mississippi settlement agreement.[16]

---

[12] Compl. (Dkt. 1). Ex. 1 (Asset Purchase Agreement) § 6.19 (emphasis added).

[13] *Id.* § 6.20 (emphasis added).

[14] *Id.*

[15] Answer (Dkt. 30) ¶ 37; Compl. (Dkt. 1) Ex. 6.

[16] Answer (Dkt. 30) ¶ 39; Compl. (Dkt. 1) Ex. 8.

On June 8, 2015, ITG Brands sent letters to Florida, Texas, and Minnesota, indicating its willingness to join the PSS settlement agreements governing those states.[17] In its letters to Texas and Minnesota, ITG Brands stated that if no joinder was in place when the Closing occurred, ITG Brands would make statutory payments on the Acquired Tobacco Cigarette Brands from that point forward.[18] ITG Brands did not join the Texas and Minnesota settlement agreements before the Closing, but alleges that it has been making statutory payments to Texas and Minnesota since then.[19]

ITG Brands did not join the Florida Settlement Agreement before the Closing and has made no payments to Florida since it purchased the Acquired Tobacco Cigarette Brands. In December 2015, about six months after the Closing, Florida and ITG Brands discussed the possibility of ITG Brands joining the Florida Settlement Agreement, but the parties did not reach an agreement.[20] On January 11, 2017, representatives from ITG Brands and Reynolds met with Florida to "discuss the potential resolution of the payment issues under the Florida Settlement Agreement," but those meetings were unsuccessful.[21]

---

[17] Answer (Dkt. 30) ¶ 42; Compl. (Dkt. 1) Exs. 9, 10, 11.

[18] Answer (Dkt. 30) ¶ 42; Compl. (Dkt. 1) Exs. 10, 11.

[19] Compl. (Dkt. 1) ¶¶ 42-43, 45.

[20] Compl. (Dkt. 1) Ex. 14.

[21] Compl. (Dkt. 1) Ex. 15.

Reynolds Tobacco is a defendant in a Florida state court action that was filed by the state of Florida. On January 18, 2017, Florida filed a motion seeking to join ITG Brands as a defendant and to enforce the Florida Settlement Agreement against both Reynolds Tobacco and ITG Brands to recover annual payments for post-Closing sales of the Acquired Tobacco Cigarette Brands.[22] According to the motion, Florida "is presently owed more than $45 million and will continue to suffer annual losses of approximately $30 million absent the Court's enforcement of the Settlement Agreement it approved and adopted more than 20 years ago."[23] The motion also states that "Reynolds made its proportionate share of the annual payments under the terms of the Settlement Agreement for nearly two decades, until recently when it sold [four] of its most iconic cigarette brands to ITG for $7 billion in cash consideration plus ITG's assumption of certain liabilities."[24]

## II.   PROCEDURAL HISTORY

On February 17, 2017, ITG Brands filed this action asserting five claims for injunctive and declaratory relief. That same day, ITG Brands filed a motion for a temporary restraining order to enjoin Reynolds from pursuing their claims against ITG Brands in the Florida action based on an exclusive Delaware forum provision

---

[22] Answer (Dkt. 30) ¶ 55; Compl. (Dkt. 1) Ex. 16 at 1, 21.

[23] Compl. (Dkt. 1) Ex. 16 at 1.

[24] *Id.* at 2.

in the Asset Purchase Agreement. The Court granted that motion, in part, on March 1, 2017.

On May 16, 2017, ITG Brands filed a motion for partial judgment on the pleadings on Count II of its complaint, seeking a declaration that any obligation ITG Brands owed to use its reasonable best efforts to reach an agreement with Florida to join the Florida Settlement Agreement terminated at the Closing. On June 23, 2017, Reynolds filed a cross-motion for partial judgment on the pleadings, seeking a declaration that ITG Brands' duty to use its reasonable best efforts to reach an agreement with Florida to join the Florida Settlement Agreement did not terminate due to the Closing.

## III. ANALYSIS

### A. Legal Standards

This Court will grant a motion for judgment on the pleadings when there are no material issues of fact and the movant is entitled to judgment as a matter of law.[25] Judgment on the pleadings "is a proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact."[26]

---

[25] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993).

[26] *Lillis v. AT&T Corp.*, 904 A.2d 325, 329-30 (Del. Ch. 2006) (internal citations and quotations omitted).

"When analyzing a contract on a motion for judgment on the pleadings, this Court will grant such a motion only if the contract provisions at issue are unambiguous."[27] "Ambiguity does not exist simply because the parties disagree about what the contract means . . . Rather, contracts are ambiguous when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[28]

The Asset Purchase Agreement, which includes the Agreed Assumption Terms, is governed by Delaware law.[29] Under Delaware law, courts are required to give unambiguous contract terms their plain meaning, without regard to extrinsic evidence.[30] Delaware law also "adheres to the objective theory of contracts, *i.e.*, a contract's construction should be that which would be understood by an objective, reasonable third party."[31] When interpreting a contract, this Court "will give priority to the parties' intentions as reflected in the four corners of the agreement," construing the agreement as a whole and giving effect to all of its provisions.[32]

---

[27] *Cooper Tire & Rubber Co. v. Apollo (Mauritius) Holdings Pvt. Ltd.*, 2013 WL 5787958, at *4 (Del. Ch. Oct. 25, 2013).

[28] *Id.* (internal citations and quotations omitted).

[29] Compl. (Dkt. 1) Ex. 1 (Asset Purchase Agreement) § 12.12.

[30] *Norton v. K-Sea Transp. Partners, L.P.*, 67 A.3d 354, 360 (Del. 2013).

[31] *Salamone v. Gorman*, 106 A.3d 354, 367-368 (Del. 2014) (citing *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)).

[32] *Id.* (citing *GMG Capital Inv., LLC. v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

In interpreting contract language, "[c]lear and unambiguous language . . . should be given its ordinary and usual meaning."[33] Courts also may look to the grammatical construction of a contractual provision to discern its meaning.[34]

## B. Reynolds' Interpretation of Section 2.2 is Supported by the Plain Language of the Asset Purchase Agreement

Reynolds contends that the phrase "prior to the Closing" as used in Section 2.2 of the Agreed Assumption Terms is part of a clause that defines the *nature of the obligations* that ITG Brands agreed to assume with each of the Previously Settled States (*i.e.*, the same obligations Reynolds Tobacco had with each of those states "prior to the Closing") and that the phrase thus did not impose a hard stop on ITG Brands' obligation to use its reasonable best efforts to reach an agreement with Florida. According to Reynolds, ITG Brands' obligation to reach an agreement with Florida remains in place until ITG Brands actually has expended its reasonable best

---

[33] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006) (quoting *Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)).

[34] *See, e.g. Paul v. Deloitte & Touch, LLP*, 974 A.2d 140, 146 (Del. 2010) (resolving grammatical dispute to determine the clear and unambiguous meaning of a contractual provision); *see also Viking Pump, Inc. v. Liberty Mut. Ins. Co.*, 2007 WL 1207107, at 17 n.97 (Del. Ch. Apr. 2, 2007, *revised* Apr. 13, 2007) (Strine, V.C.) (quoting *Wirth & Hamid Fair Booking, Inc. v. Wirth*, 192 N.E. 297, 300 (1934)) ("[P]unctuation and grammatical construction are reliable signposts in the search for contractual intent."); 11 Williston on Contracts § 32:9 (4th ed.) ("Courts often pay attention to grammar and punctuation in determining the proper interpretation of a contract.").

efforts to do so.  In making this argument, Reynolds primarily relies on the grammatical construction and structure of Section 2.2.

The first sentence of Section 2.2 of the Agreed Assumption Terms provides, in relevant part, that:

> [ITG Brands], with the assistance and cooperation of [Reynolds American] and Lorillard in communications and negotiations as required by the Agreement, shall use its reasonable best efforts to reach agreements with each of the Previously Settled States, by which [ITG Brands] will assume, as of the Closing, the obligations of a Settling Defendant under the PSS Agreement with each such State, with respect to the Acquired Tobacco Cigarette Brands, on the same basis as the Settling Defendants prior to the Closing.[35]

This sentence consists of an independent clause and a dependent clause.[36]  The independent clause, which expresses a complete thought, appears at the beginning of the sentence: "[ITG Brands], with the assistance and cooperation of [Reynolds American] and Lorillard in communications and negotiations as required by the Agreement, shall use its reasonable best efforts to reach agreements with each of the Previously Settled States . . ."  The dependent clause, which does not express a complete thought, comprises the latter part of the sentence: ". . . by which [ITG

---

[35] Compl. (Dkt. 1) Ex. 1 (Asset Purchase Agreement) F-2 § 2.2.

[36] "An independent clause is one that contains a subject and a predicate and makes sense standing alone, that is, it expresses a complete thought." *Hamilton v. Werner Co.*, 268 F. Supp. 2d 1085, 1088 (S.D. Iowa 2003) (citing Kenneth G. Wilson, *The Columbia Guide to Standard American English* 243 (1993)).  "A dependent clause is a subject-verb construction that could not stand alone as a sentence." Bryan A. Garner, *The Redbook: A Manual on Legal Style* § 1.6(d) (2d. ed. 2006).

Brands] will assume, as of the Closing, the obligations of a Settling Defendant under the PSS Agreement with each such State, with respect to the Acquired Tobacco Cigarette Brands, on the same basis as the Settling Defendants prior to the Closing."

The first, independent clause requires ITG Brands to "use its reasonable best efforts to reach agreements with each of the Previously Settled States." The second, dependent clause describes the nature of the "agreements" to be reached. Specifically, under the PSS settlement agreements, ITG Brands will assume, as of the Closing, the same obligations that the Settling Defendants had prior to the Closing.[37] In other words, Section 2.2 provides that, when ITG Brands assumes the obligations of the Settling Defendants, it will step into the shoes that Reynolds Tobacco occupied prior to the Closing. Thus, the phrase "prior to the Closing" is a time reference that adds precision to the nature of the obligations that ITG Brands agreed to use its reasonable best efforts to assume with each of the Previously Settled States.

This interpretation is consistent with the "nearest-reasonable-referent canon," which provides that a modifying phrase "normally applies only to the nearest reasonable referent."[38] Here, the nearest reasonable referent to "prior to the Closing"

_____

[37] As discussed below, the obligation to assume the "same" obligations that the Settling Defendants had prior to the Closing is subject to the proviso in the second sentence of Section 2.2.

[38] *Parm v. Nat'l Bank of Cal., N.A.*, 835 F.3d 1331, 1336 (11th Cir. 2016) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 153 (2012));

16

is the immediately preceding language "on the same basis as the Settling Defendants," not the phrase "shall use its reasonable best efforts" that appears fifty words earlier in a separate clause.

ITG Brands acknowledges that the nearest-reasonable referent canon is an accepted canon of contract construction but argues that "on the same basis as the Settling Defendants" is not a reasonable referent. I disagree. The phrase "prior to the Closing" adds precision to the nature of the obligations that ITG Brands agreed to use its reasonable best efforts to assume. By serving as a time reference for the language immediately preceding it, the phrase makes clear that ITG Brands will step into the shoes that the Settling Defendants occupied before the Closing and not as of some other point in time.[39]

---

*see also U.S. Fire Ins. Co. v. Kelman Bottles*, 538 Fed. Appx. 175, 180 (3d Cir. 2013) (same).

[39] ITG Brands argues that "Reynolds' interpretation reads more ambiguity into the contract since the term 'prior to [the] Closing' is not a specific date and therefore could mean the obligations that existed *at any time* 'prior to [the] Closing'" and that if "the parties agreed that the term 'prior to [the] Closing' refers only [to] the scope of the obligations . . . they would have used 'at closing.'" Pl. Reply Br. (Dkt. 54) 10. Use of the phrase "at closing" to define the nature of the obligations to be assumed would not be a clear solution, however. It could be argued that Reynolds American already had transferred the Acquired Tobacco Cigarette Brands to ITG Brands "at" the Closing and thus no longer had any obligations with respect to those brands. Perhaps the parties could have used somewhat more precise language when drafting Section 2.2, such as "immediately prior to the Closing." No principled reason has been advanced, however, why one seriously would think that ITG Brands should assume obligations under the Florida Settlement Agreement that existed at some earlier point in time but had been modified before the Closing. That is not to say that the inclusion of a time reference to define the obligations to be assumed was unnecessary— such a reference certainly is necessary for precision—but just that the "Court will not

By contrast, the referent ITG Brands proposes is not reasonable and would give "unjustifiably expansive modifying power" to the modifier "prior to the Closing."[40] ITG Brands asks the Court to find that the phrase "prior to the Closing" jumps over the action of the clause in which it appears to modify an action that appears fifty words earlier in a separate clause. But it is more natural to give the sentence an orderly grammatical sense, in which the independent clause is set forth in full and then the dependent clause is set forth in full, rather than finding that "prior to the Closing" modifies an action that appears in a separate clause.

Construing the phrase "prior to the Closing" to define the nature of the obligations that ITG Brands agreed to assume also is consistent with how the second sentence in Section 2.2 operates. That sentence states, as follows:

> **Provided**, however, that such agreements shall include terms providing either that any direct-pay statute (also known as an equity-fee law or NPM-fee law) of a Previously Settled State does not apply to the Acquired Tobacco Cigarette Brands or that, if [ITG Brands] is required to make payments with respect to Acquired Tobacco Cigarette Brands under a direct-pay statute (or any distributor or other party is required to make such payments with respect to the Acquired Tobacco Cigarette Brands), [ITG Brands] will receive a credit against otherwise due payments under the PSS settlement equal to the full payments made.[41]

---

manufacture an ambiguity where one does not exist." *See, e.g. Julian v. Julian*, 2010 WL 1068192, at *8 (Del. Ch. Mar. 22, 2010).

[40] *See U.S. Fire Ins. Co.*, 538 F. App'x at 180 (explaining that, by overlooking six words separating a modifier from its supposed referent, "the District Court gave an unjustifiably expansive modifying power to" the modifier).

[41] Compl. (Dkt. 1) Ex. 1 (Asset Purchase Agreement) F-2 § 2.2 (emphasis added).

The second sentence is a proviso, *i.e.*, "a clause that introduces a condition by the word *provided*."[42]   A proviso "conditions the principal matter that it qualifies," which is "almost always the matter immediately preceding."[43]

Here, the proviso makes clear that, if a Previously Settled State has a direct-pay statute, ITG Brands is entitled to obtain contractual protection against making double payments on the Acquired Tobacco Cigarette Brands, *i.e.*, either the state will agree to exempt ITG Brands from the direct-pay statute or will give it a credit for any payments it makes under the statute.  Significantly, the proviso addresses the *nature of the obligations* that ITG Brands agreed to assume with each of the Previously Settled States.  As such, because the proviso qualifies the immediately preceding dependent clause where the phrase "prior to the Closing" appears, it is logical to interpret that preceding clause in parallel fashion as also addressing the nature of the obligations ITG Brands must seek to assume.  ITG Brands has offered no substantive response to this point.

Finally, Reynolds asserts that, in addition to the plain language of Section 2.2 itself, Sections 6.19 and 6.20 of the Asset Purchase Agreement support the conclusion that ITG Brands' obligation to use its reasonable best efforts to reach an

---

[42] Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 154 (2012).

[43] *Id.*

19

agreement with Florida did not terminate at the Closing. Those provisions expressly require the parties to take action "both before and after the Closing" to comply with the Agreed Assumption Terms, in which Section 2.2 appears. Specifically, Section 6.19 provides, in relevant part, that:

> . . . *both before and after the Closing*, each of the Parties shall . . . take all such other steps . . . as are necessary and/or expedient for the purposes of . . . (c) obtaining the agreement as necessary of the States . . . to the Agreed Assumption Terms.[44]

Section 6.20 similarly provides, in relevant part, that:

> . . . each of the Parties undertakes that from and after the date of this Agreement and *both before and after the Closing* it shall . . . adhere fully to and not deviate in any respect from the Agreed Assumption Terms including in any communications with any of the States. . . Each of [ITG Brands] and [Reynolds American] further undertakes *from and after the Closing*, . . . to take all such steps as are necessary or expedient . . . to cause the Agreed Assumption Terms, as applicable, to become fully effective and binding on each of the States.[45]

"[W]ell established canons of contract interpretation require courts to read a contract as a whole."[46] "In giving sensible life to a real-world contract, courts must read the specific provisions of the contract in light of the entire contract."[47] Reading

---

[44] Compl. (Dkt. 1) Ex. 1 (Asset Purchase Agreement) § 6.19 (emphasis added).

[45] *Id.* § 6.20 (emphasis added).

[46] *Am. Legacy Found. v. Lorillard Tobacco Co.*, 831 A.2d 335, 344 n.37 (Del. Ch. 2003), *aff'd sub nom. Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 731 (Del. 2006); *see also Northwestern Nat'l Ins. Co. v. Esmark, Inc.,* 672 A.2d 41, 43 (Del. 1996) ("Contracts must be construed as a whole, to give effect to the intentions of the parties.").

[47] *Chicago Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 913-14 (Del. 2017).

Section 2.2 in light of the "both before and after the Closing" language in Sections 6.19 and 6.20 of the Asset Purchase Agreement, it makes sense that the reasonable best efforts clause in Section 2.2 also was intended to operate beyond the Closing.

ITG Brands agrees that Sections 6.19 and 6.20 "encompass and provide general obligations that cover the Agreed Assumption Terms as a whole" and "make plain that [the parties'] communication and other obligations apply 'both before and after the Closing.'"[48] ITG Brands contends, however, that the provisions do not apply to Section 2.2 on the theory that the specific language of Section 2.2 trumps the more general language of Sections 6.19 and 6.20. I disagree.

The rule of contractual interpretation that a "specific provision ordinarily qualifies the meaning of [a] general one" logically applies where "specific and general provisions conflict."[49] But there is no necessary conflict here. As discussed above, the plain language of Section 2.2 of the Agreed Assumption Terms compels the conclusion that ITG Brands' obligation to use its reasonable best efforts to reach an agreement with Florida did not terminate at the Closing. As such, this provision is entirely consistent with Sections 6.19 and 6.20, which expressly provide, among other things, that the parties shall cause the Agreed Assumption Terms to become fully effective and binding on each of the States "both before and after the Closing."

---

[48] Pl. Reply Br. (Dkt. 54) 7, 23.

[49] *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005).

For the reasons explained above, the plain language of Section 2.2 supports the conclusion that ITG Brands' obligation to use its reasonable best efforts to reach an agreement with Florida to assume Reynolds Tobacco's obligations under the Florida Settlement Agreement for the Acquired Tobacco Cigarette Brands did not terminate due to the Closing.[50]

## C. ITG Brands' Interpretation of Section 2.2 is Unreasonable

ITG Brands argues that the phrase "prior to the Closing" in Section 2.2 defines the *temporal scope* of its obligation to use its reasonable best efforts to reach an agreement with Florida. In making this argument, ITG Brands advances its own grammatical construction of the provision and contends that its interpretation is supported by other provisions of the Asset Purchase Agreement. ITG Brands' interpretation is unreasonable in my view for essentially five reasons.

First, ITG Brands' reading of Section 2.2 is based on the premise that the phrases italicized below, which consist of text set off by commas in the first sentence

---

[50] Pointing to the fact that ITG Brands seemed to invite post-Closing negotiations with three of the Previously Settled States in letters it sent them a few days before the Closing (*see* Compl. (Dkt. 1) Exs. 9-11), Reynolds argues that ITG Brands' course of conduct is inconsistent with its litigation position concerning the meaning of Section 2.2. I do not consider this evidence because course of conduct evidence generally is irrelevant to construing an unambiguous contract provision. *See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 (Del. 1997) ("In construing an *ambiguous contractual provision*, a court may consider evidence of prior agreements and communications of the parties as well as trade usage or course of dealing.") (emphasis added).

of Section 2.2, are "nonrestrictive clauses" that could be taken out of the sentence without changing its essential meaning:[51]

> **[ITG Brands]**, *with the assistance and cooperation of [Reynolds American] and Lorillard in communications and negotiations as required by the Agreement*, **shall use its reasonable best efforts to reach agreements with each of the Previously Settled States**, *by which [ITG Brands] will assume, as of the Closing, the obligations of a Settling Defendant under the PSS Agreement with each such State, with respect to the Acquired Tobacco Cigarette Brands*, **on the same basis as the Settling Defendants prior to the Closing**.

According to ITG Brands, when these nonessential terms are disregarded, the remaining text (in bold above) makes clear that the parties intended for the phrase "prior to the Closing" to refer back to the obligation to use reasonable best efforts and to impose a firm deadline on that obligation. ITG Brands then argues that the phrase "on the same basis as the Settling Defendants" tells the parties all they need to know about what obligations ITG Brands must seek to assume. Under this theory, "prior to the Closing" must be a temporal limitation or it would be surplusage.[52]

"The cardinal rule of contract construction is that, where possible, a court should give effect to *all* contract provisions."[53] This Court thus must "read a contract

---

[51] Pl. Opening Br. (Dkt. 42) 14-15, 14 n.5; *see also* Tr. 10 (Sept. 11, 2017).

[52] *See* Tr. 10-11, 35-36, 38-39, 41, 93 (Sept. 11, 2017).

[53] *Sonitrol Holding Co. v. Marceau Investissements*, 607 A.2d 1177, 1184 (Del. 1992) (emphasis in original) (citing *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1114 (Del. 1985)).

as a whole and . . . give each provision and term effect, so as not to render any part of the contract mere surplusage."[54]

A basic flaw in ITG Brands' argument is that it would render meaningless important qualifications in the language of Section 2.2 italicized above. For example, the italicized language makes clear that the obligations ITG Brands must seek to assume only concern the four "Acquired Tobacco Cigarette Brands" (Winston, Salem, Kool, and Maverick) and not any of the brands that Reynolds Tobacco retained. This qualification is not already embedded in the phrase "on the same basis as the Settling Defendants," which covers the full universe of Reynolds Tobacco's obligations to the Previously Settled States, including its obligation to continue making payments on cigarette brands it retained. This qualification is thus essential to define accurately the nature of the obligations ITG Brands must seek to assume. Similarly, the italicized language is necessary to ensure that the obligations are assumed "as of the Closing" and not as of some other time. Because ITG Brands' proffered construction gives no meaning to these important qualifications, its construction of Section 2.2 is unreasonable.

Second, and related to the first point, adopting ITG Brands' interpretation of Section 2.2 would give unjustifiably expansive modifying power to the modifier

---

[54] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (quoting *Kuhn Construction, Inc. v. Diamond State Port Corp.,* 2010 WL 779992, at *2 (Del. Mar. 8, 2010)).

"prior to the Closing," as discussed above. Apart from its "nonrestrictive clause" theory, ITG Brands offers no rule of construction to warrant interpreting Section 2.2 in such a strained manner as to find that the phrase "prior to the Closing" jumps over the action of the clause in which it appears to modify an action that appears fifty words earlier in a separate clause.

To repeat, it is more natural to give the sentence an orderly grammatical reading, in which the independent clause is set forth in full and the dependent clause is then set forth in full. When the sentence is read in that manner, the phrase "prior to the Closing" serves as a necessary time reference for the language immediately preceding it to make clear that, with respect to the Acquired Tobacco Cigarette Brands, ITG Brands must seek to assume the obligations Reynolds Tobacco owed before the Closing and not at some other time. In that way, the provision achieves the obvious objective of having ITG Brands step into the shoes that Reynolds Tobacco occupied before the Closing.

Third, if the parties wanted "prior to the Closing" to define when ITG Brands' duty to use its reasonable best efforts would expire, the parties logically would have placed that phrase within the independent clause, close to the action they wanted it to modify. For example, the provision easily could have been written to state that ITG Brands "*shall use* its reasonable best efforts, *prior to the Closing*, . . .". This formulation would have mirrored another part of the same sentence providing that

25

ITG Brands "*will assume*, *as of the Closing*, the obligations . . ."  There, the parties placed a modifier ("as of the Closing") next to a verb ("will assume") to define when that action would occur, demonstrating that they knew how to place a temporal modifier on an action when they wished to do so.[55]

Fourth, I am unpersuaded by ITG Brands' argument that its construction is supported by other provisions in the Asset Purchase Agreement using the phrase "reasonable best efforts."   According to ITG Brands, Section 6.11(b) of the Asset Purchase Agreement "uses both 'reasonable best efforts' and 'prior to the Closing' in exactly the same way as Section 2.2 does."[56]  The relevant sentence of Section 6.11(b) states: "Each of the Parties shall use its reasonable best efforts to identify and develop Service Descriptions for all Transitional Services prior to the Closing." This sentence, however, consists of a single clause with a simple structure.  It is nothing like the first sentence of Section 2.2, where "prior to the Closing" appears in a dependent clause fifty words away from the action that ITG Brands suggests it should modify.  Put differently, the phrase "use its reasonable best efforts" is the

---

[55] *See Roseton OL, LLC v. Dynegy Holdings Inc.*, 2011 WL 3275965, at *10 (Del. Ch. July 29, 2011) (comparing two contractual provisions and noting that the language of the second provision "demonstrates that when the parties intended to make a particular restriction applicable to both DHI and its subsidiaries, they knew how to do so and readily could accomplish that objective").

[56] Pl. Rely Br. (Dkt. 54) 3.

nearest reasonable referent for "prior to the Closing" in Section 6.11(b), but not in Section 2.2.

The only other provision in the Asset Purchase Agreement that ITG Brands makes any effort to discuss is Section 2.02(a), which states, in part, that:

> [Reynolds American] will, and will cause each of the other Sellers … to, use its and their reasonable best efforts to obtain any consent necessary for the transfer or assignment of any such Transferred Asset claim, right or benefit to [ITG Brands] at no cost to [ITG Brands] … If on or prior to the Closing Date any such consent is not obtained, . . . (i) at the Closing, the Sellers and [ITG Brands] will enter into one or more mutually agreeable Contracts under which [ITG Brands] would obtain the benefits and assume the obligations and bear the economic burdens associated with such Transferred Asset . . . (ii) after the Closing Date, [Reynolds American] will, and will cause each of the other Sellers to, continue to use its and their reasonable best efforts to obtain any consent necessary . . . [57]

This provision, which draws a distinction between obligations owed "at" and "after" the Closing, operates very differently than Section 2.2 of the Agreed Assumption Terms. Far from aiding ITG Brands, Section 2.02(a) confirms that there is nothing remarkable about having a "reasonable best efforts" obligation extend beyond the Closing without a specific end-point.

Fifth, ITG Brands' interpretation would lead to an absurd result in my view. Delaware courts avoid adopting "[a]n unreasonable interpretation [that] produces an absurd result or one that no reasonable person would have accepted when

---

[57] Compl. (Dkt. 1) Ex. 1 (Asset Purchase Agreement) § 2.02(a).

27

entering the contract."[58]  But here, adopting ITG Brands' reading of Section 2.2 would have the nonsensical result of incentivizing ITG Brands to stall its discussions with Florida until after the Closing in order to avoid making annual payments tied to *its own sales* of cigarette products.[59]

The Master Settlement Agreement and PSS settlement agreements were intended to provide each of the states with a continuous stream of annual payments for "health care costs that those States had paid for their citizens who smoked."[60] Those annual payments are based on the volume of cigarette sales that occur in that year.  The obvious purpose of Section 2.2 was to transfer to ITG Brands the payment obligations associated with the Acquired Tobacco Cigarette Brands so that the payment obligation runs with the party benefiting from the revenues.  In my view, no reasonable tobacco manufacturer would have agreed to expose itself to the prospect of making annual payments to a Previously Settled State for cigarette

---

[58] *Osborn*, 991 A.2d at 1160.

[59] The obligation in Section 2.2 applies to each of the four Previously Settled States.  The perverse incentive to stall, however, is most acute in ITG Brands' discussions with Florida. Unlike the three other Previously Settled States, Florida does not have a direct-pay statute that guarantees a stream of payments based on cigarette sales volume irrespective of a contractual assumption of liability.

[60] Answer (Dkt. 30) ¶ 20.

product revenues it no longer receives by incentivizing an acquiror to stall and run out the clock.[61]

ITG Brands admits that its interpretation would create such "an incentive"[62] but argues that Reynolds' reading of Section 2.2 would lead to two other unreasonable results. ITG Brands first contends that if a PSS settlement agreement were amended post-Closing, it would be joining on terms different from those binding other signatories.[63] As an initial matter, this would not be unreasonable. The whole point of the time referent "prior to the Closing" in Section 2.2 is to make clear which obligations ITG Brands agreed to use its reasonable best efforts to assume, *i.e.*, the same ones that governed "the Settling Defendants prior to the Closing." It is not unreasonable to hold ITG Brands to the bargain it struck.[64]

---

[61] This is the predicament in which Reynolds Tobacco now finds itself. Although ITG Brands agrees that Reynolds Tobacco should no longer have any obligations with respect to the Acquired Tobacco Cigarette Brands "because sales of those brands were no longer included in its volume" (Answer (Dkt. 30) ¶ 27), Florida apparently disagrees. It is seeking to enforce the Florida Settlement Agreement against both Reynolds Tobacco and ITG Brands for those sales. *See* Answer (Dkt. 30) ¶ 55; Compl. (Dkt. 1) Ex. 16, 1.

[62] Tr. 51.

[63] Pl. Reply Br. (Dkt. 54) 9-13.

[64] ITG Brands' concern also seems imaginary. If Reynolds Tobacco amended a PSS settlement agreement post-Closing in some beneficial way for the brands it retained, it is hard to imagine that the state involved would not agree to comparable terms with ITG Brands for the brands it acquired. And, if Reynolds Tobacco were to amend a PSS settlement agreement post-Closing in some manner that ITG Brands viewed to be adverse, ITG Brands undoubtedly would prefer not to be bound to use its reasonable best efforts to agree to such an amendment with respect to the Acquired Tobacco Cigarette Brands.

29

ITG Brands' second contention is that Reynolds' interpretation of Section 2.2 would mean that ITG Brands' obligation to use its reasonable best efforts would go on "potentially forever."[65] This argument is without merit. A duty to use reasonable best efforts is not limitless in time but simply requires that one actually expend *reasonable* best efforts, which is a question of fact.[66] Indeed, as discussed above, ITG Brands expressly agreed in at least one other provision of the Asset Purchase Agreement (Section 2.02(a)) to use its reasonable best efforts after the Closing and thus cannot be heard to suggest that undertaking such an obligation would lead to an unreasonable result.

\* \* \* \* \*

For the reasons explained above, the plain language of Section 2.2 does not support the conclusion that ITG Brands' obligation to use its reasonable best efforts terminated at the Closing, an interpretation I find to be unreasonable.

---

[65] Pl. Opening Br. (Dkt. 42) 17.

[66] *See Williams Co., Inc. v. Energy Transfer Equity, L.P.*,159 A.3d 264, 273 (Del. 2017) ("reasonable best efforts" covenants impose "an affirmative obligation" to "take all reasonable steps to solve problems and consummate the [contemplated] transaction"); *Lewes Inv. Co. v. Estate of Graves*, 2013 WL 508486, at \*17 (Del. Ch. Feb. 12, 2013), *aff'd*, 74 A.3d 654 (Del. 2013) ("What constitutes a 'reasonable time' is a question of fact, dependent on the circumstances of the case.").

## IV. CONCLUSION

As explained above, Reynolds' interpretation of Section 2.2 is supported by the plain and unambiguous language of that provision, but ITG Brands' interpretation is not. Accordingly, Reynolds' motion for partial judgment on the pleadings is granted, and ITG Brands' cross-motion is denied. In holding that ITG Brands' obligation under Section 2.2 to use its reasonable best efforts did not terminate due to the Closing, the Court expresses no view on whether or not such efforts have been expended, which is a fact question that must be decided on an appropriate record. The parties are directed to submit a form of order implementing this decision within five business days.

**IT IS SO ORDERED.**